IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VANESSA COLLINS, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No.  3:17-CV-921-K-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | Referred to U.S. Magistrate Judge |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

By *Special Order No. 3-251*, this social security appeal was automatically referred for full case management. Before the Court are *Plaintiff's Brief on Appeal*, filed July 26, 2017 (doc. 15), and *Defendant's Brief*, filed August 25, 2017 (doc. 16). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED.**

### I.  BACKGROUND[1]

Vanessa Collins (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) and for supplemental security income (SSI) under Title XVI of the Act.  (docs. 1, 15.)

### A.    Procedural History

On April 16, 2014, Plaintiff filed her applications for DIB and SSI, alleging disability beginning March 10, 2014. (R. at 220-30.) Her claims were denied initially and upon

---

[1]   The background information is summarized from the record of the administrative proceeding, which is designated as "R."

reconsideration.  (R. at 138-53.)  Plaintiff requested a hearing before an administrative law judge (ALJ), and she personally appeared and testified at a hearing on December 14, 2015.  (R. at 34-68.) On June 1, 2016, the ALJ issued a decision finding her not disabled and denying her claims for benefits.  (R. at 10-22.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council and included new medical evidence. (R. at 8-9.)  The Appeals Council determined that the new evidence did not provide a basis for changing the decision and denied her request for review on October 27, 2016, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-7.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born on December 31, 1958, and was 56 years old at the time of the hearing before the ALJ. (R. at 40, 220.) She completed the 11th grade, but had not graduated from high school or received any equivalent degree, such as a GED. (R. at 43.) She had past relevant work as a cleaner/housekeeper. (R. at 18, 62-63.)

**2.    Medical Evidence**

On May 3, 2013, Plaintiff presented to the emergency room of Parkland Memorial Hospital (Parkland) with "radiating substernal" chest pain. (R. at 385-483.) She reported shortness of breath but no headaches or dizziness. (R. at 385-86.) A "systolic murmur" was discovered during the physical examination, and she was transferred to a cardiology specialist for an angiographic diagnostic test. (R. at 387-89, 393-96.) The test results showed inflammation and a "thickened aortic wall and thickening of the major arterial trunks arising from the aorta" consistent with aortitis. (R.

at 391, 402-03.) Her left ventricle was found to be "hyperdynamic," and there was "severe aortic regurgitation." (R. at 391.) She was admitted to Parkland for a catheterization coronary procedure, in which a "sheath" was "inserted into the right femoral artery" in order to "define [her] coronary anatomy." (R. at 423-24.) The procedure identified no coronary artery disease, but her "right subclavian artery appear[ed] occluded at the origin of the right vertebral artery." (R. at 425.) Upon discharge, it was noted that her chest pain had "been resolved," and the diagnostic testing showed normal systolic function, normal chamber sizes, and a decreased level of aortic regurgitation. (R. at 405.) She was diagnosed with aortitis, prescribed Prednisone, and instructed to return in one month for a follow-up evaluation. (R. at 405.)

On June 4, 2013, Plaintiff presented to the cardiology clinic at Parkland for a follow-up evaluation. (R. at 471-75.) She denied chest pain, and the physical examination showed no abnormalities with a "regular" heart beat and "no murmurs/rubs/gallops." (R. at 473.) She had a "normal gait/muscular tone" and a normal "neuro/psych" assessment. (R. at 473.) Plaintiff was instructed to continue taking Prednisone and to follow-up with a rheumatologist to treat the inflammation in her heart valve. (R. at 474.)

On September 17, 2013, Plaintiff presented to the rheumatology clinic at Parkland for an evaluation of her aortitis and valve inflammation. (R. at 303-08.) She had not been taking all of her medications as prescribed; she also reported soreness in her left wrist and forearm after a recent fall, but denied fatigue, chest pain, and early morning stiffness in her joints. (R. at 303.) It was noted that she had a "grossly normal" station and gait, no "appreciable synovitis" in her wrists, elbows, and shoulder, and a full range of motion in her lumbar spine, hip, knees, and ankles. (R. at 305.) A "discrepancy" was identified in her pulse and blood pressure readings with the left arm having

stronger measurements than the right arm. (R. at 306.) It was found that her clinical symptoms suggested Takayasu's arteritis, and she was prescribed Prednisone and Methotrexate. (R. at 306.)

From October 11, 2013, to February 28, 2014, Plaintiff had monthly follow-up appointments at the cardiology clinic at Parkland. (R. at 312-18, 337-40, 347-50, 369-72.) During each appointment, she reported no chest pain or problems except for "mild" shortness of breath upon exertion. (R. at 313, 337, 347, 369.) Her physical examinations consistently noted that she was a "well nourished female in no acute distress" with a "normal gait/muscular tone" and "alert & oriented x3 [with an] intact judgment and insight." (R. at 315, 338, 348, 370.) She frequently did not take her medication as prescribed, so she was regularly counseled "on the importance of compliance." (R. at 316, 350, 372.) During her appointment on February 28, 2014, she was instructed to continue on Prednisone and Methotrexate and return in three months for an evaluation. (R. at 369-72.)

On October 30, 2013, Plaintiff received an echocardiogram of her heart at Parkland to further assess her Takayasu's arteritis and aortitis. (R. at 329-30.) Her left ventricular posterior wall dimension was 1.00cm, her intraventricular septal dimension was 0.92 cm, and her left atrium dimension was 3.8cm. (R. at 330.) It was noted that her ventricles, atria, mitral valve, tricuspid valve, aortic valve, and pulmonic valve were all "normal in structure and function," but there were signs of "severe aortic regurgitation." (R. at 329-30.) She had an "ejection fraction" of 68%. (R. at 330.) The results showed that her left ventricular end-diastolic dimension had increased from 4.3cm to 4.8cm and her aortic regurgitation had "slightly worsened" since her prior evaluation on May 3, 2013. (R. at 330, 339.)

Plaintiff returned to the cardiology clinic at Parkland for follow-up evaluations on May 8,

4

2014, November 6, 2014, and December 4, 2014. (R. at 492-99, 536-41, 552-57.) She had "no complaints" at each appointment. (R. at 495, 536, 552.) The physical exams showed "no chest pain . . . or heart failure symptoms," no muscle pain, no weakness, and no loss of balance. (R. at 495, 536, 552.) The record noted that "[f]unctionally, she [did] not formally exercise, but [she] walks most places she goes," and she could "walk up 3 flights of stairs without difficulty." (R. at 495, 536.) She also answered "no" at all three evaluations when asked if she had "any discomfort, aching, or fatigue in either leg when walking," and it was noted that she had a "normal gait/muscular tone." (R. at 496-97, 537-38, 553-54.) Her aortic regurgitation was consistently found to be "currently asymptomatic" where it did "not meet immediate criteria for surgical valve repair," but the doctors were "concerned that she will soon need surgery." (R. at 498, 540, 556.) Her coronary artery disease was also assessed as "asymptomatic" and "non-obstructive, but present." (R. at 499, 540, 556.)

On June 30, 2014, Dr. Leigh McCary, M.D., a state agency medical consultant (SAMC), completed a Physical Residual Functional Capacity (RFC) Assessment form based upon Plaintiff's medical evidence in the record. (R. at 140-43.) She determined that her primary diagnoses were "diseases of aortic valve." (R. at 140.) She opined that Plaintiff had the following exertional limitations: occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk with normal breaks for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday, with an unlimited ability to push/pull. (R. at 141-42.) She further opined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (R. at 142.) She concluded that Plaintiff's alleged limitations were "partially supported" by the medical evidence, but the alleged severity and limiting effects were "not wholly supported." (R. at 142.)

On July 15, 2014, and October 13, 2014, Plaintiff presented to the rheumatology clinic at

5

Parkland for treatment and an evaluation of her Takayasu's arteritis. (R. at 503-07, 526-32.) She denied any chest pain, early morning stiffness, or joint swelling at both appointments, and she reported that she could "walk up about 3 flights of stairs" without taking a break. (R. at 503, 526.) Her musculoskeletal exams showed a "grossly normal" station and gait, no inflammation, motor strength rated at "5/5,"and a full range of motion in her wrists, elbows, shoulders, lumbar spine, hip, knees, and ankles. (R. at 504, 526-27.) During her appointment on July 15, 2014, she complained of bilateral knee pain that was "worse when she [sat] down and [got] better at times when she walks." (R. at 503.) This pain had an "unclear etiology" but "seem[ed] consistent" with osteoarthritis. (R. at 505.) She was prescribed Tramadol for the pain. (R. at 505.) During her appointment on October 13, 2014, she did not report any pain in her knees, but she did identify pain in her left forearm. (R. at 526.) She was instructed to rest her arm and was not prescribed any pain medication. (R. at 529-32.)

On September 11, 2014, Dr. Kelvin Samaratunga, M.D., a SAMC, reviewed the medical evidence on record and completed a Physical RFC assessment upon reconsideration. (R. at 149-51.) Dr. Samaratunga agreed with Dr. McCary's Physical RFC assessment from June 30, 2014, and he opined that Plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk with normal breaks for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday, with an unlimited ability to push/pull. (R. at 149-50.) He further opined that she had no postural, manipulative, visual, communicative, or environmental limitations. (R. at 150.)

On November 14, 2014, Plaintiff received an echocardiogram of her heart at Parkland. (R. at 555-56, 571-72.) Her left ventricular posterior wall dimension was 1.00cm, her intraventricular septal dimension was 0.99 cm, and her left atrium dimension was 3.1cm. (R. at 571.) The results

showed normal chamber sizes, normal left ventricular systolic function, normal right ventricle size and function, and normal right atrial pressure. (R. at 556, 572.) There continued to be evidence of "severe aortic regurgitation," but her left ventricular end-diastolic dimension measured 4.5cm and was "essentially unchanged" from her prior evaluation on October 30, 2013. (R. at 556, 571.)

On April 6, 2015, October 5, 2015, and November 2, 2015, Plaintiff returned to the rheumatology clinic at Parkland. (R. at 605-10, 661-68, 690-97.) She denied any early morning stiffness, joint swelling, shortness of breath, abdominal pain, or numbness during each of her evaluations. (R. at 607, 661, 690-91.) Her musculoskeletal exams showed a "grossly normal" station and gait, no inflammation, motor strength rated at "5/5," and a full range of motion in her wrists, elbows, shoulders, lumbar spine, hip, knees, and ankles. (R. at 608, 663, 692.) During her appointment on April 6, 2015, she reported mild headaches that occurred "every 2-3 days" and lasted for 20 minutes, but she reported that they were "better" at her next appointment. (R. at 607-09, 661.) On October 5, 2015, she reported pain in her lower extremities and "right chest wall," but stated that this pain was "better" on November 2, 2015. (R. at 661, 690.) Her Takayasu's arteritis was assessed as "doing well," and she was instructed to continue on Prednisone. (R. at 697.)

On December 15, 2015, Plaintiff received an echocardiogram of her heart at Parkland. (R. at 699-703.) Her left ventricular posterior wall dimension was 1.1cm, her intraventricular septal dimension was 1.00 cm, and her left atrium dimension was 4.0cm. (R. at 699.) Her ventricles, mitral valve, tricuspid valve, and pulmonic valve were all "normal," but her left atrium was "borderline dilated." (R. at 700.) Her aortic valve was "thickened but open[ed] well," and it showed signs of "moderate to severe" aortic regurgitation. (R. at 700.)

On May 10, 2016, Plaintiff returned to the rheumatology clinic at Parkland. (R. at 789-94.)

She had "generally been feeling well," but she had "tingling in her hands and feet," dizziness, "frequent" headaches, fatigue, shortness of breath, and difficulty walking 1-2 city blocks. (R. at 790.) Her musculoskeletal exams showed a "grossly normal" station and gait, and there was no inflammation or synovitis in her hands, wrists, elbows, shoulders, spine, knees, ankles, and feet. (R. at 792.) She also had a "full range of motion" in her knees and "good mobility" in her ankles. (R. at 792.) Her Takayasu's arteritis had been responding to treatment. (R. at 793.) Her postural dizziness was opined to be caused by her blood pressure, particularly her diastolic readings. (R. at 793.)

### 3.    Hearing Testimony

Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ on December 14, 2015. (R. at 34-68.) Plaintiff was represented by an attorney. (R. at 36.)

### a.    *Plaintiff's Testimony*

Plaintiff testified that she was 56 years old, single, and had no young children. (R. at 40-41.) She stood 5'4" tall and weighed 120 pounds on average. (R. at 41.) She dropped out of high school after finishing the 11th grade, and she had not received a GED or any vocational training. (R. at 42-43.) She most recently had worked for the St. Martin's Group as a "nursing home housekeeper" from 2004 to 2014. (R. at 45-46.) She had stopped working there because it went out of business, and she "couldn't do it no more" due to pain and fatigue. (R. at 46, 60.) She had not worked since March 10, 2014, but she had received unemployment benefits after the St. Martin's Group went out of business. (R. at 41-42.)

When asked about her medical problems, Plaintiff testified that she had issues with her heart, rheumatoid arthritis, and headaches. (R. at 46-47.) Her heart had a "leaky valve" that caused chest

pains and weakness where she could "hardly walk and stand up." (R. at 48.) She had chest pains "every two to three days," which caused "terrible pain" for "[l]ike six seconds" and occurred without warning. (R. at 49-50.) She never had surgery or congestive heart failure. (R. at 47, 49.) The only limitation imposed by her cardiologists was that she could "lift nothing heavy and stuff like that." (R. at 50.) Plaintiff also identified arthritis in her hands, feet, and knees, which would "all hurt equally bad" and be stiff in the morning. (R. at 51-52.) A "lady" at Baylor told her that she had rheumatoid arthritis because she "got to hurting" in her knees, legs, and arms. (R. at 47.) She took Prednisone daily for inflammation, and she had problems "gripping or holding things." (R. at 51, 61.) She rated her average arthritis pain as "10/10," which the ALJ defined as the pain you feel when "you're on your way to the emergency room." (R. at 52.) Plaintiff also explained that she had migraine-type headaches "like, every day" and had been prescribed Tramadol. (R. at 53.) The pain medication helped for "about four to five hours" whenever she took a dose. (R. at 53-54.)

In reference to her physical limitations, Plaintiff stated that she could walk "probably about one" city block at a time, stand for "about 10 minutes"  before having to rest, sit for "about 40 minutes" before having to stand up, and she had to lie down "about two hours" on an average day. (R. at 55-57.) She lived in a one-story house with her elderly father, but neither could perform any of the daily chores, such as cooking, cleaning, laundry, or grocery shopping. (R. at 58.) Plaintiff's daughter performed all of these chores, even though she did not live with them. (R. at 58-59.)

### b.    VE's Testimony

The VE testified that he had reviewed Plaintiff's vocational records and determined that she had the past relevant work of cleaner/housekeeper, DOT 323.687-014 (SVP: 2, light, unskilled). (R. at 63.)

The ALJ asked the VE what "would be the maximum tolerance for absenteeism" for the cleaner/housekeeper job, to which the VE responded "no more than one or two days a month." (R. at 63.) The ALJ then asked the percentage of time outside scheduled breaks that an employer for an unskilled position would tolerate the employee being "off task." (R. at 63.) The VE replied that it would be "no more than 10 percent in an 8-hour work day," which would be the equivalent of a "short restroom break but nothing more each hour." (R. at 64.)

Plaintiff's attorney asked the VE if a hypothetical individual could perform Plaintiff's past relevant work if she was limited to occasional stooping, crouching, bending, and kneeling. (R. at 64.) The VE responded that this hypothetical individual could still perform Plaintiff's past relevant work as a cleaner/housekeeper. (R. at 64.) Plaintiff's attorney then asked whether a hypothetical individual could perform Plaintiff's past relevant work if she "needed the option to alternate between sitting and standing" due to pain and fatigue. (R. at 64-65.) The VE testified that this individual would not be able to perform the job of cleaner/housekeeper. (R. at 65.)

## C.   ALJ's Findings

The ALJ issued a decision denying benefits on June 1, 2016. (R. at 10-22.) At step one,[2] she determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 10, 2014. (R. at 15.) At step two, the ALJ found that the medical evidence established that Plaintiff had a severe combination of the following impairments: aortic regurgitation; aortitis; Takayasu's disease; and coronary artery disease due to lipid right plaque. (R. at 15-16.) At step three, the ALJ concluded that Plaintiff's severe impairments or combination of impairments did not meet or equal the requirements for presumptive disability under the listed impairments in 20 C.F.R.

---

[2] The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described more specifically below.

Part 404. (R. at 16.)

The ALJ then determined that Plaintiff retained the residual functional capacity (RFC) to perform light work with the following exceptions: able to lift or carry 20 pounds occasionally; able to lift or carry 10 pounds frequently; and able to sit, stand, or walk for 6 to 8 hours in an 8-hour workday in 2 hour intervals. (R. at 16-18.)

At step four, the ALJ found that Plaintiff was able to perform her past relevant work of cleaner/housekeeper based upon the VE's testimony. (R. at 18.) Because she determined that Plaintiff could perform her past relevant work, the ALJ did not reach step five. (R. at 18-19.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset of disability date of March 10, 2014, through the date of the decision. (R. at 19.)

**D.    New Evidence Submitted to the Appeals Council**

Plaintiff timely appealed the ALJ's decision to the Appeals Council and submitted new evidence consisting of Parkland medical records that were dated from June 24, 2016, to September 30, 2016. (R. at 69-137.) These records included her follow-up evaluations at Parkland's cardiology clinic, as well as an updated CT scan of her aorta. (R. at 69-71, 78-84, 89-95, 104-09.) The scan showed a "mild increase in the mild circumferential wall thickening," but "unchanged" overall. (R. at 82-83.) Her aortic regurgitation and coronary artery disease continued to be assessed as "asymptomatic." (R. at 83, 94-95.)

The new evidence also included the medical records from Plaintiff's visit to Parkland's emergency room on September 3, 2016. (R. at 114-27.) During that visit, she complained of a "sharp" pain in the middle of her chest that had lasted "20 minutes" and a headache that had lasted

for "3-4 months." (R. at 115.) She reported that it was the "first time that she [had] ever had this type of [chest] pain" before. (R. at 115.) Her musculoskeletal exam showed a "normal range of motion" with no evidence of edema, tenderness, arthralgia, myalgia, neck pain, or neck stiffness. (R. at 117.) X-rays of her chest showed "no acute cardiopulmonary process" issues, and another CT scan showed that her aorta had remained "unchanged" since her prior scan. (R. at 120-22.) She was diagnosed with "chest pain," and because her "tests and [] current condition [were] re-assuring," she was not prescribed any pain medication and was instead instructed to follow-up with her primary care physician. (R. at 119.)

The Appeals Council denied her request for review on October 27, 2016, and determined that the additional evidence did "not provide a basis for changing the [ALJ's] decision." (R. at 1-2.) The Council explained that the new medical evidence was "about a later time" than the period of alleged disability covered by the ALJ's decision, so "it [did] not affect the decision about whether [she was] disabled beginning on or before May 26, 2016." (R. at 2.)

## II. LEGAL STANDARD

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the

record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

13

3.      An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.      If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUE FOR REVIEW

Plaintiff presents one issue for review:

1.      The ALJ failed to fully and fairly develop the record. The Plaintiff presented additional evidence that was not reviewed by a medical doctor and evidenced the worsening of her medical impairments. The evidence was not properly considered in analyzing whether the Plaintiff met or equaled a listed impairment and the impact the worsening of her medical impairments had on

her RFC.

(doc. 15 at 4.)  She argues that the ALJ's findings were "not an accurate assessment of [her] ability to perform work related activities because the record was not fully developed" and should have included a consultative examination of her physical limitations. (*Id*. at 8-9.)

An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton v Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). When the ALJ fails in this duty, she does not have before her sufficient facts upon which to make an informed decision, and her decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). For this reason, a reviewing court may reverse the ALJ's decision if the claimant can show that "(1) the ALJ failed to fulfill [her] duty to develop the record adequately and (2) that failure prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012). The duty to obtain medical records generally belongs to the claimant, however.  *See Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205 at *7 (N.D. Tex. Mar. 25, 2011).

"The decision to order a consultative examination is within the ALJ's bailiwick." *Harper v. Barnhart*, 176 F. App'x 562, 566 (5th Cir. 2006). An ALJ must order a consultative evaluation, however, when it is necessary to enable her to make the disability determination. *See Brock*, 84 F.3d at 728 (citing *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)).  A consultative evaluation becomes "necessary" only when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment.  *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (per curiam). Isolated comments without further support by a

claimant are insufficient to raise a suspicion of non-exertional impairment. *See Pierre v. Sullivan*, 884 F.2d 799, 802-03 (5th Cir. 1989) (per curiam) (holding isolated comments about claimant's low intelligence insufficient to raise suspicion that claimant was mentally retarded); *Brock*, 84 F.3d at 728 (holding the claimant's references amounted to isolated comments because he did not mention non-exertional impairments in his original request for benefits, he never sought medical treatment for such impairments, and he did not mention these impairments at his hearing). When evidence in the record supports a conclusion that the claimant is not disabled, a consultative exam is not necessary. *See Turner*, 563 F.2d at 671. Additionally, the duty to develop the record can be effectuated by the ALJ's questioning of the claimant regarding her education, training, past work history, the circumstances of her injury, daily routine, pain, and physical limitations, and providing an opportunity to add anything else to the record. *See Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015) ("Consistent with that description, the court often focuses on the ALJ's questioning of the claimant in order to determine whether the ALJ gathered the information necessary to make a disability determination.") (citing *Brock*, 84 F.3d at 728).

During the hearing, Plaintiff's lawyer pointed out that there was no consultative examination in the record, and she asked the ALJ if that was "something you feel is necessary, or do you think . . . you have enough information." (R. at 65.) The ALJ responded that she "hadn't seen anything that . . . suggested the need for [a consultative examination]." (R. at 66.) Specifically in reference to the limitations in Plaintiff's hands, she stated that "when [medical examiners are] looking to rheumatoid arthritis, they're looking for swelling, warm, redness; and [Plaintiff] just keeps coming . . . up negative," and "every time she goes in to her rheumatologist, they are looking at these things." (*Id.*) She then asked Plaintiff's lawyer if she had "overlooked

something you feel I ought to look at," to which the lawyer responded "[n]o, I just wanted to point that out . . . ." (*Id.*) The ALJ also kept the record open for a 45-day period after being notified that Plaintiff was scheduled for an echocardiogram the following day. (R. at 38-39, 65.)

In making her decision, the ALJ was provided and considered over 500 pages of medical records spanning nearly 3 years from various clinics at Parkland, as well as 2 different RFC assessments from the non-examining SAMCs. (R. at 138-53, 287-798.) Her decision cited to specific medical findings that were the most pertinent to Plaintiff's physical limitations and noted how "a review of the record in this case reveals no specific restrictions recommended by any treating physician." (R. at 15-18.) It also reviewed the evidence submitted after the hearing, including the echocardiogram results from December 15, 2015, which showed "moderate to severe aortic regurgitation . . . [but] normal chamber sizes and normal LV and RV systolic function." (R. at 18.) Based upon the medical record, the ALJ gave "great weight" to the SAMCs' opinions that Plaintiff was capable of a "light" RFC because these assessments were "consistent with the medical evidence of record." (R. at 18.)

Plaintiff contends that the ALJ erred when she failed to request a consultative physical examination and instead "erroneously played doctor" when determining that the SAMCs' RFC assessments were consistent with the medical evidence submitted after their review.[3] (doc. 15 at 12.) She argues that the ALJ made an improper "medical conclusion" in accepting those RFC assessments because the evidence showed that her impairments had "worsened" since the SAMCs' evaluations. (*Id.*) As support, she points to her echocardiogram results from December

---

[3]   The phrase "playing doctor" was used in *Frank v. Barnhart*, 326 F.3d 618, 621-22 (5th Cir. 2003), which held that the ALJ erred when he drew his own medical conclusions that were contrary to the claimant's subjective statements and the weight of "vast" medical evidence.

17

15, 2015, the treatment notes from her rheumatology appointment at Parkland on May 10, 2016, and the ALJ's failure to analyze the existence of chronic heart failure under Listing 4.02.[4] (*Id.* at 12-13) (citing R. at 699-700, 790-93).

The ALJ's decision specifically referenced Plaintiff's echocardiogram results from December 15, 2015, and cited to the cardiologist's "interpretation summary," which detailed how Plaintiff had "moderate to severe aortic regurgitation" but "normal chamber sizes" and "normal LV and RV systolic function." (R. at 18, 699.) Though the specific valve measurements increased in size from her prior echocardiogram, her cardiologist appointments continued to assess her aortic regurgitation and coronary artery disease as "asymptomatic." (R. at 83, 94-95.) The SAMCs, moreover, considered her prior echocardiogram from October 30, 2013, which similarly showed "worsening" valve measurements where her left ventricular end-diastolic

---

[4] Listing 4.02 for chronic heart failure requires that both the "A" and "B" criteria are satisfied, specifically:

A. Medically documented presence of one of the following: 1. Systolic failure, with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or 2. Diastolic failure, with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure); AND B. Resulting in one of the following: 1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or 2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period, with evidence of fluid retention from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization; or 3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to: a. Dyspnea, fatigue, palpitations, or chest discomfort; or b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise due to left ventricular dysfunction, despite an increase in workload; or d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 4.02

diameter had increased since her initial evaluation on May 3, 2013. (R. at 329-30.) Based upon

these medical records, the ALJ gave the SAMCs' opinions "great weight" because they were

"consistent" with the medical evidence. (R. at 17-18.) This does not show that the ALJ "played

doctor;" it shows that she fulfilled her role as the finder of fact to weigh the evidence in the

record, resolve all conflicts in the evidence, and make an administrative assessment of Plaintiff's

ability to work. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (explaining that "[t]he

mere presence of some impairment is not disabling *per se*"); *see also Coats v. Colvin*, No.

3:12-CV-4968-M, 2013 WL 6052879, at *5 (N.D. Tex. Nov. 14, 2013) (noting that an ALJ "is

not playing doctor by determining which of contradictory medical opinions to credit [because]

that is precisely the type of conflict he is called upon to resolve") (citing *Perez*, 415 F.3d at 461).

Plaintiff's updated rheumatology records and the ALJ's failure to consider Listing 4.02[5]

in her decision similarly do not show that the ALJ failed to develop the record or "played

doctor." Plaintiff has not pointed to any medical evidence that establishes the necessary criteria

to meet Listing 4.02 for chronic heart failure,[6] and the updated rheumatology records did not

---

[5] At step three, the ALJ found that Plaintiff's impairments did not "meet or medically equal the required criteria of Listing 4.04 for ischemic heart disease or any other listed impairment." (R. at 16.) She explained that Listing 4.04 had not been met because "there was not a sign or symptom limited exercise test demonstrating the required manifestations at a workload equivalent to 5 METS," there was no evidence of three separate ischemic episodes that required revascularization, and no evidence that Plaintiff had coronary artery disease with the required angiographic evidence. (R. at 16.)

[6] Although Plaintiff contends that the ALJ failed to "properly consider" the medical evidence under Listing 4.02 for chronic heart failure, she does not appear to bring this as a separate issue but simply as "further evidence" that the ALJ "erroneously played doctor" instead of fully developing the record. (doc. 15 at 12.) To the extent that she brings this issue separately, she fails to meet her burden to identify evidence showing that she met Listing 4.02 or that the ALJ's failure to consider chronic heart failure at step three was harmful error. *See Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). (noting that the claimant has the burden of proving that her impairment or combination of impairments meets or medically equals one of the listings); *see also Milligan v. Colvin*, No. 3:14-CV-868-L, 2014 WL 7028038, at *6 (N.D. Tex. Dec. 12, 2014) (finding no harmful error when the plaintiff did not point "to record evidence that could sufficiently meet the A and B requirements of Listing 4.02 and [did] not identify any other listing nor the evidence to support a finding on that listing").

diagnose her with rheumatoid arthritis and did not find any swelling, pain, or tenderness in her hands, wrists, and elbows during the musculoskeletal exam. (R. at 787-92.) The ALJ's decision was further supported by substantial evidence, including the records from Parkland's cardiology clinic noting "asymptomatic" heart problems with no reports of chest pain (R. at 495-97, 536-40, 552-56), and the records from Parkland's rheumatology clinic noting that she could "walk up about 3 flights of stairs" without a break, had a "grossly normal" station and gait, no "appreciable synovitis" in her hands, wrists, elbows, and shoulders, and a full range of motion in her lumbar spine, hip, knees, and ankles. (R. at 305, 504, 527-28, 608, 663, 692, 792). There is no indication that the medical records before the ALJ were inadequate, or that she lacked sufficient facts to make a determination. *See Pierre*, 884 F.2d at 802 ("The decision to require such an examination is within the discretion of the ALJ."). The ALJ fulfilled her duty to fully and fairly develop the record. Remand is not warranted on this basis.

## IV. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**

**SO RECOMMENDED** on this 19th day of March, 2018.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE